IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Rusby Adams, Jr., et al.,

      Plaintiffs,

      v.                   Case No. 2:10-cv-826

Anheuser-Busch Companies,
Inc., et al.,

      Defendants.

<u>OPINION AND ORDER</u>

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, <u>et seq</u>. Plaintiffs Rusby Adams, Jr., Leslie Schell, Daniel Stewart and Kevin Jones are former employees of the Metal Container Corporation ("MCC"), a subsidiary of defendant Anheuser-Busch Companies, Inc. ("ABC"). Adams was employed at the MCC plant in Columbus, Ohio, Schell and Stewart were employed at the MCC plant in Gainesville, Florida, and Jones was employed at the MCC plant in Fort Atkinson, Wisconsin. As employees of MCC, plaintiffs were participants in the Anheuser-Busch Companies Pension Plan ("the Plan"). Administrative Record ("AR"), Ex. 1. ABC was acquired by InBev, N.V. ("InBev"), a Belgian beverage company, on November 18, 2008. MCC was later sold to Ball Corporation ("Ball") on or about October 1, 2009, and plaintiffs were then employed by Ball.

At or around the time of the sale of MCC, plaintiffs made claims for benefits under §19.11(f) of the Plan. AR Exs. 2-A (Adams claim letter dated September 25, 2009), 3-A (Schell claim letter dated December 23, 2009), 4-A (Stewart claim letter dated September 25, 2009), and 5-A (Jones claim letter dated October 5, 2009). Section §19.11(f) states that the retirement benefit of

any participant "whose employment with the Controlled Group is involuntarily terminated within three (3) years after the Change in Control" shall be entitled to certain enhanced retirement benefits. Plaintiffs claimed that because they were no longer employed by an ABC-affiliated "Controlled Group" company within three years of the acquisition of ABC due to Ball's acquisition of MCC, their employment had been "involuntarily terminated" within the meaning of §19.11(f), and they were entitled to the enhanced retirement benefits.

Plaintiffs were notified on December 23, 2009, that their claims for benefits under §19.11(f) were being denied because they had accepted employment with Ball Corporation.  AR Exs. 2-B, 3-B, 4-B, and 5-B.  On February 18, 2010, plaintiffs appealed the denial of their benefits to the Anheuser-Busch Companies Pension Plans Appeals Committee ("the Committee").  AR Exs. 2-C, 3-C, 4-C, and 5-C.  On June 17, 2010, the appeal was denied by the Committee.  AR Exs. 2-F, 3-F, 4-F, and 5-F.

Plaintiffs then filed the instant action as individuals and as representatives of a class of similarly-situated former employees of MCC.  Count One of the complaint asserted a claim for benefits pursuant to 29 U.S.C. §1132(a)(1)(B), and Count Two advanced a claim for breach of fiduciary duty under 29 U.S.C. §1132(a)(2).  By order dated April 25, 2011, this court granted defendants' partial motion to dismiss.  Count Two of the complaint and the claims against defendants Anheuser-Busch InBev and Jeff Karrenbrock were dismissed.  The remaining defendants are the Plan, the Committee, and ABC.

By orders dated March 28, 2012, and April 2, 2012, this court

granted plaintiffs' motion for class certification and certified the following class:

> All persons who were participants in or beneficiaries of the Anheuser-Busch Companies Pension Plan and the Supplement for the Anheuser-Busch Salaried Employees' Pension Plan (the "Plan") who were employed at any Metal Container Corporation plant within the "Controlled Group" of Anheuser-Busch-related companies that was sold to a buyer outside the "Controlled Group" (the "Amended Proposed Class") at any time between November 18, 2008 and November 17, 2001 (the "Class Period").

This matter is now before the court on plaintiffs' motion for judgment on the administrative record. Defendants have filed a brief in support of the Committee's decision.

I. Standard of Review

A. Arbitrary and Capricious Standard of Review

A plan administrator's denial of benefits is reviewed de novo unless the benefit plan specifically gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Morrison v. Marsh & McLennan Companies, Inc., 439 F.3d 295, 300 (6th Cir. 2006). Where an ERISA plan gives the plan administrator such discretionary authority, the administrator's decision is reviewed under the arbitrary and capricious standard. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 111 (1989). The Plan in this case provides that the "Plan Administrator shall have such duties and powers as may be necessary to discharge its duties hereunder, including, but not by way of limitation, the following: (a) to construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder[.]" Plan §14.5. The Plan states:

3

An interpretation or construction placed upon any term or provision of the Plan by the Plan Administrator, any decisions and determinations of the Plan Administrator of any matter arising under the Plan, including without limiting the generality of the foregoing, ... (c) the time, method and amounts of payments payable under the Plan, (d) the rights of Participants, their spouses, and Beneficiaries, and any other action or determination or decision whatsoever taken or made by the Plan Administrator in good faith shall be final, conclusive, and binding upon all persons concerned, including, but not limited to, the Company, Participating Employers, Employees and former Employees, Participants and former Participants, and their spouses and Beneficiaries.

Plan §14.6.  The Plan further provides:

[T]he interpretation of all Plan provisions, and the determination of whether a Participant or Beneficiary is entitled to any benefit pursuant to the terms of the Plan, shall be exercised by the Plan Administrator in its sole discretion.  Any construction of the terms of the Plan for which there is a rational basis that is adopted by the Plan Administrator shall be final and legally binding on all parties.

Plan §14.11.

The "Plan Administrator" is defined as "[s]uch person as the Company [ABC} may so designate in writing, or in the absence of such designation, the Company."  Plan §§1.1.11, 1.1.38.  The Plan defines "Administrative Committee" as "[a]ny group of individuals who may be appointed by the Plan Administrator from time to time in accordance with Section 15."  Plan §1.1.4.  Section 15 of the Plan authorizes the Plan Administrator to appoint a committee of at least three persons to perform all or any part of the duties of the Plan Administrator.  There is no dispute that the three-member Committee is a Plan Administrator.  Because the Plan gives the Plan Administrator discretionary authority to determine eligibility for benefits and to interpret the terms of the Plan, this court will

4

apply the arbitrary and capricious standard of review.

"Review under the arbitrary and capricious standard is the least demanding form of judicial review of an administrative action; it requires only an explanation based on substantial evidence that results from a deliberate and principled reasoning process." Morrison, 439 F.3d at 300; see also Shields v. Reader's Digest Ass'n, Inc., 331 F.3d 536, 541 (6th Cir. 2003)("When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious."); Williams v. International Paper Co., 227 F.3d 706, 712 (6th Cir. 2000)(if there is a reasonable explanation for the administrator's decision denying benefits in light of the plan's provisions, then the decision is neither arbitrary nor capricious).

"The arbitrary and capricious standard requires courts to review the plan provisions and the record evidence and determine if the administrator's decision was 'rational.'" Schwalm v. Guardian Life Ins. Co. of America, 626 F.3d 299, 308 (6th Cir. 2010). In reviewing the administrator's decision, the court's review is limited to the administrative record which was before the plan administrator at the time of the benefit determination. Schwalm, 626 F.3d at 308.

Where the plan grants the administrator discretionary authority to construe and interpret the provisions of the plan, the administrator is entitled to "great leeway in interpreting ambiguous terms." Shelby County Health Care Corp. v. Southern Council of Indus. Workers Health and Welfare Trust Fund, 203 F.3d 926, 935 (6th Cir. 2000). The court "must accept a plan administrator's rational interpretation of a plan even in the face

of an equally rational interpretation offered by the participants." Morgan v. SKF USA, Inc., 385 F.3d 989, 992 (6th Cir. 2004); see also Mitzel v. Anthem Life Ins. Co., 351 Fed.App'x 74, 81 (6th Cir. 2009)("Under the arbitrary and capricious standard, courts must favor a plan administrator's interpretation over an equally reasonable contrary interpretation.")(emphasis in original, citing Morgan).

B. Conflict of Interest

The Plan is a self-funded plan, and the Committee members are ABC employees. Where a plan is a self-funded plan and employees make the decisions regarding an award of benefits, the administrator's self-interest must be taken into account in applying the arbitrary and capricious standard of review. McCartha v. National City Corp., 419 F.3d 437, 442 (6th Cir. 2005); see also Gismondi v. United Techs. Corp., 408 F.3d 295, 299 (6th Cir. 2005)(noting that there is an actual, readily apparent conflict when the company or plan administrator is the insurer that ultimately pays the benefits). The conflict of interest inherent in self-funded plans does not alter the standard of review, but rather is taken into account as a factor in determining whether the decision was arbitrary and capricious. Peruzzi v. Summa Medical Plan, 137 F.3d 431, 433 (6th Cir. 1998); see also Metropolitan Life Ins. Co. v. Glenn, 554 U.S. 105 (2008).

More weight is given to the conflict where circumstances suggest a higher likelihood that it affected the benefits decision. DeLisle v. Sun Life Assurance Co. of Canada, 558 F.3d 440, 445 (6th Cir. 2009). A long history of biased claims administration may render the conflict more important, as opposed to a situation where

the administrator has taken active steps to reduce potential bias and to promote accuracy, in which case the conflict is less important. See Curry v. Eaton Corp., 400 Fed.App'x 51, 58 (6th Cir. 2010). A plan participant must provide "significant evidence" that the conflict actually affected or motivated the benefits decision. Peruzzi, 137 F.3d at 433. If the conflict of interest did not actually motivate the administrator's decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious. See Curry, 400 Fed.App'x at 59 (noting lack of indication that the denial of benefits specifically was motivated in any part by the conflict of interest); Pflaum v. UNUM Provident Corp., 175 Fed.App'x 7, 10 (6th Cir. 2006)(noting that where plaintiff pointed to nothing beyond the mere existence of a conflict of interest to show that the administrator's decision was motivated by self-interest, "we give no further consideration in the arbitrary and capricious analysis to the possibility that the conflict affected" the decision).

C. Review of Plan Terms

Under ERISA, every employee benefit plan must be established and maintained pursuant to a written instrument specifying the basis on which payments are to be made from the plan. 29 U.S.C. §§1102(a)(1) and 1102(b)(4); Kennedy v. Plan Administrator for DuPont Savings and Investment Plan, 555 U.S. 285, 300 (2009). The plan administrator is obliged to act in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of ERISA. 29 U.S.C. §1104(a)(1)(D). A plaintiff's claim under §1132(a)(1)(B) "therefore stands or falls by 'the terms of the

7

plan[.]'" <u>Kennedy</u>, 555 U.S. at 300 (quoting §1132(a)(1)(B)). "Accordingly, in determining whether benefits were due under the Plan, the starting point is the language of the Plan itself." <u>Farhner v. United Transportation Union Discipline Income Protection Program</u>, 645 F.3d 338, 343 (6th Cir. 2011).

Federal common law rules of contract interpretation apply in construing an ERISA plan, and a plan's provisions must be interpreted "according to their plain meaning, in an ordinary and popular sense." <u>Perez v. Aetna Life Ins. Co.</u>, 150 F.3d 550, 556 (6th Cir. 1998). Courts are not permitted to rewrite contracts by adding additional terms. <u>Id.</u> at 557. In developing federal common law rules of contract interpretation, courts take direction from both state law and general contract law principles. <u>Id.</u> at 556. The Plan in this case provides that the Plan is governed by Delaware law except as pre-empted by federal law. Plan §1.2(b). Thus, in addition to applying the federal common law of ERISA, this court will look for guidance to Delaware law, although the basic Delaware and federal law of contract interpretation are substantially the same in this context.

Under both federal and Delaware law, the interpretation and construction of a contract is a matter of law for the court. <u>See Detroit Radiant Products Co. v. BSH Home Appliances Corp.</u>, 473 F.3d 623, 627 (6th Cir. 2007); <u>Paul v. Deloitte & Touche, LLP</u>, 974 A.2d 140, 145 (Del.Supr. 2009). Under Delaware law, a contract's construction should be that which would be understood by an objective, reasonable third party. <u>Osborne ex rel. Osborn v. Kemp</u>, 991 A.2d 1153, 1159 (Del.Supr. 2010). When a contract is clear and unambiguous, courts will give effect to the plain meaning of

the contract's terms and provisions.  <u>Id.</u> at 1159-60; <u>see also</u> <u>Williams</u>, 227 F.3d at 711 (when interpreting ERISA plan provisions, general principles of contract law dictate that the provisions be interpreted according to their plain meaning in an ordinary and popular sense).  A court must construe the agreement as a whole, giving effect to all provisions therein; however, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan.  <u>E.I. du Pont de Nemours and Co., Inc. v. Shell Oil Co.</u>, 498 A.2d 1108, 1113 (Del. 1985).

If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.  <u>Eagle Industries, Inc. v. DeVilbiss Health Care, Inc.</u>, 702 A.2d 1228, 1232 (Del.Supr. 1997).  "A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction."  <u>Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.</u>, 616 A.2d 1192, 1196 (Del. 1992).  "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."  <u>Id.</u>

## II. Review of Committee's Decision

### A. Section 19.11

The Plan at issue in this case is the Plan restated as of January 1, 2001, as amended.  <u>See</u> AR Ex. 1.  Section 19.11 of the Plan is entitled "Change in Control" and was effective as of September 28, 2000.  Section 19.11(d) provides that the "Accrued Benefit of each Participant who is actively employed by a

Participating Employer as of the date of a Change in Control shall be fully vested." The Plan further provided that during the three years following a change in control, the formulas for determining benefits and "the forms of payment available under the Plan shall not be reduced ... and no other benefits, rights and features ... available to Participants shall be eliminated." Plan §19.11(e)(ii) and (iii).

Section 19.11(f), the provision particularly at issue in this case, states:

> The Normal Retirement Benefit, Late Retirement Benefit, Early Retirement Benefit or Termination Benefit of any Participant under the Supplement for the Anheuser-Busch Salaried Employees' Pension Plan ... <u>whose employment with the Controlled Group is involuntarily terminated</u> within three (3) years after the Change in Control ... shall be determined by taking into account an additional five (5) years of Credited Service and Vesting Service and, for purposes of Section 4.3 only, an additional five (5) years of age, and shall in any event be at least fifteen percent (15%) larger than the Participant's Normal Retirement Benefit, Late Retirement Benefit, Early Retirement Benefit or Accrued Benefit, as calculated without regard to this Section 19.11(f) as of the date the Participant's employment with the Controlled Group ends; provided that nothing in this Section 19.11(f) shall cause acceleration of a Participant's Payment Date under the Plan.

Section 19.11(f) (emphasis supplied).

The phrase "Controlled Group" is defined as "the controlled group of corporations, trades and businesses ... of which the Company is a part, as determined from time to time." Plan §1.1.13. The Plan incorporates the definition of "Change in Control" found in the ABC 1998 Incentive Stock Plan, which defines that term as an "agreement of merger or consolidation with another corporation or business entity." The acquisition of ABC by InBev on November 18,

10

2008, was the first and only "Change in Control" to occur since the adoption of §19.11(f). The Plan does not define "employment" or "involuntarily terminated."

B. Plaintiffs' Claims for Benefits

In a memorandum to employees dated August 21, 2009, ABC took the position that salaried employees who were offered a position with Ball were not eligible for enhanced benefits under §19.11(f). After September 30, 3009, the effective date of the sale of MCC to Ball, plaintiffs filed their claims for benefits under §19.11(f). Plaintiffs argued that because their employment "with the Controlled Group" had been terminated, they were entitled to benefits under §19.11 even though their actual employment otherwise was not terminated, but rather continued uninterrupted under Ball, the new owner of the assets of MCC. Those claims for benefits were denied on the basis that plaintiffs were offered and accepted employment with Ball with compensation and benefits substantially equivalent in the aggregate to the compensation and benefits to which they were entitled immediately prior to the sale. AR Exs. 2-B, 3-B, 4-B, and 5-B. The denial letter included the following reasoning:

> The purpose for the special benefits under Section 19.11(f) is to provide additional benefits to individuals who are out of work after they involuntarily lose their employment within three years after a change in control of Anheuser-Busch Companies, Inc. (which occurred on November 18, 2008). In order for that Section to apply, there must be an actual break in an individual's employment, rather than simply a change in the legal entity employing the individual, or the owner of that entity, during a continuous employment period. In addition, the break in employment must be involuntary, which would not be the case where an individual is offered, but does not accept, comparable employment with a successor entity. Section 19.11(f) was not intended to

11

> apply to situations where an individual does, or is offered the opportunity to, continue employment without any break in the same or similar position and under terms that are substantially similar to those that existed prior to the sale of a facility or entity.  In those situations, there has been no involuntary termination of employment within the meaning of Section 19.11(f).

AR Exs. 2-B, 3-B, 4-B, 5-B.  The decision further stated that because plaintiffs had all been offered and accepted employment with Ball in positions and under terms that were substantially similar to those provided to them prior to the sale, and because their employment continued without a break, plaintiffs' employment was not "involuntarily terminated" within the meaning of §19.11(f).  AR Exs. 2-B, 3-B, 4-B, and 5-B.

C. Decision on Appeal

1. Denial of Benefits as Transferred Salaried Employees

Plaintiffs pursued appeals from the denial of benefits to the Committee.  By letters dated June 17, 2010, the appeals were denied.  See AR Exs. 2-F, 3-F, 4-F, and 5-F.  The Committee first noted that the terms of the Asset Purchase Agreement with Ball required Ball to offer employment as of September 30, 2009, the closing date, to salaried employees actively employed and providing services for facilities sold as of that date, with compensation and benefits substantially equivalent in the aggregate to the compensation and benefits provided immediately prior to the sale.[1]

---

[1]Specifically, the Sale Agreement states that the

Acquiror shall offer to each Transferred Employee who commences employment with the Acquiror as of the Closing Date, effective immediately following the Closing, the same initial salary or hourly wage rate level as the salary or hourly wage rate level in effect with the Seller immediately prior to the Closing Date....

AR Ex. 2-D.  The Sale Agreement further provides that Ball was required to provide substantially comparable annual salary and benefits to transferred

12

The Committee reviewed information regarding plaintiffs' employment and participation in the Plan. The Committee also reviewed an analysis of the compensation and benefits provided to salaried employees whose employment was transferred to Ball, and determined that their base pay remained the same and that they received substantially equivalent aggregate compensation and benefits as required by the Asset Purchase Agreement. See AR Exs. 2-F, 3-F, 4-F, 5-F.

The Committee concluded that plaintiffs were not entitled to enhanced benefits under §19.11(f) because they "were offered employment in a position under terms that were substantially similar to those provided to [them] prior to the sale... and therefore their "employment was not involuntarily terminated within the meaning of Section 19.11(f)." AR Exs. 2-F, 3-F, 4-F, and 5-F. In arriving at this conclusion, the Committee considered the provisions of the Plan; evidence of the drafter's intent, including minutes of the Board of Directors and the Pension Committee of the Board, and information provided by Tom Larson, an ABC employee who was involved in the discussions surrounding the adoption of §19.11(f); information concerning the application of §19.11(f); and an opinion letter provided by outside counsel which "advised that there was a reasonable basis for the determination that individuals who were employed by a successor organization in the same capacity and with substantially equivalent wages and benefits were not involuntarily terminated within the meaning of Section 19.11(f)." AR Exs. 2-F, 3-F, 4-F, and 5-F.

The Committee's decision denying the appeals states:

---

salaried employees for a year after the closing date. Ex. 2-D.

Relying on the Board minutes, the opinion of outside
counsel and other information considered by the Committee
during its review, we find that the Section 19.11(f)
enhanced benefit was intended to be provided only to
Participants who incur an actual termination of
employment as opposed to a change in ownership of the
entity employing the individual in the same job without
interruption. Individuals who continue their employment
in their same positions have not suffered the same harm
or incurred the same detriment as those whose positions
are eliminated in connection with the type of
restructuring that generally occurs following a change in
control. It is the situation of the elimination of
positions and similar losses of employment that we
believe the enhanced benefit provided by Section 19.11(f)
was designed to address.

AR Exs. 2-F, 3-F, 4-F, and 5-F. The Committee noted that because
plaintiffs, as Transferred Salaried Employees under the Ball
purchase agreement, were offered and accepted continued employment
as of the closing date of the sale of assets to Ball, "they
suffered no actual termination of employment in any sense." The
Committee concluded that §19.11(f), which requires an "involuntary
termination" of employment, did not apply to such transferred
employees. See AR Exs. 2-F, 3-F, 4-F, and 5-F.

The court will now address in more detail the information in
the administrative record which was considered by the Committee.

2. Review of Other Plan Provisions

In reaching its decision, the Committee reviewed other terms
contained in the Plan. The Committee considered the language of
§19.11, as well as §§14.6 and 14.11, which grant to the Plan
Administrator the sole discretionary authority to interpret the
provisions of the Plan and to make good faith benefit
determinations which are binding on all parties. See AR Exs. 2-F,
3-F, 4-F, and 5-F. The Committee's decision further stated that

14

the "Committee also reviewed other provisions of the Plan (including Sections 3.1(a) and 2.5). The Committee believes that, reading the plan as a whole, the enhanced benefit provided in the Change in Control provisions does not apply to your situation." AR Exs. 2-F, 3-F, 4-F, and 5-F.

Plan §3.1 governs the determination of a participant's severance from service date, provides as follows:

<u>Severance from Service Date</u>

Except as otherwise provided in Section 3.2, the Severance from Service Date of an Employee shall be the earlier of:

(a) the date on which the Employee resigns, retires, dies or is discharged from employment with all members of the Controlled Group, <u>including for this purpose a termination of employment in connection with sale of part or all of its interest in an incorporated or unincorporated business or assets by a member of the Controlled Group.</u>

Plan §3.1(a) (emphasis supplied).

The Committee stated in its decision

While the transfer of employment in connection with a sale of an entity or assets is specifically addressed in Section 3.1(a) in defining "Severance from Service Date", there is no similar specification in Section 19.11(f). As a result, a "termination" qualifying for enhanced benefits under the Change in Control provisions does not necessarily include a transfer of employment in connection with a sale of an entity or assets."

<u>See</u> AR Exs. 2-F, 3-F, 4-F, and 5-F.

Plaintiffs argue that the phrase "for this purpose" was intended to clarify that a transfer of employment following the sale of a company can qualify as a resignation or discharge under §3.1(a), and was not intended to limit the application of the phrase "transfer of employment in connection with a sale of an

15

entity or assets" to a determination of an employee's severance from service date under §3.1(a). They argue that because the term "discharge" in §3.1(a) includes a termination of employment in connection with the sale of an entity, the Committee should have interpreted the word "terminated" in §19.11(f) as including termination of employment in connection with the sale of an entity. They also note payroll documents which show their termination date as being the effective date of the sale of MCC to Ball. However, the plain language "for this purpose" clearly limits the phrase "termination of employment in connection with a sale of an entity or assets" in §3.1(a) to its use as a factor in determining an employee's severance from service date. Thus, the fact that plaintiffs' severance from service date is listed in accordance with §3.1(a) as being the effective date of the sale of MCC to Ball does not render the Committee's interpretation of §19.11(f) arbitrary and capricious. No language in §3.1(a) mandates that the phrase "termination of employment in connection with a sale of an entity or assets" be incorporated into the words "termination" or "terminated" found in other sections of the Plan such as §19.11(f).

The Committee noted the fact that the Plan drafters included language in §3.1(a) which specified that a "termination of employment in connection with the sale of an entity or assets" qualified as a "discharge" for the purpose of determining the participant's severance from service date, but did not include similar language in describing eligibility for benefits under §19.11(f). The Committee viewed this omission in §19.11(f) as an indication that "a 'termination' qualifying for enhanced benefits under [§19.11(f)] does not necessarily include a transfer of

16

employment in connection with a sale of an entity or assets."  AR Exs. 2-F, 3-F, 4-F, and 5-F.

The Committee could reasonably infer from the lack of any specific reference to a sale of an entity in §19.11(f) that the drafters did not "necessarily" intend for the word "terminated" in §19.22(f) to have the same meaning as the word "discharged" in §3.1(a), with its specific but limited qualifying phrase.  This conclusion was not unreasonable.  See Active Asset Recovery, Inc. v. Real Estate Asset Recovery Services, Inc., No. CIV.A. 15478 (unreported), 1999 WL 743479 (Del.Ch. Sept. 10, 1999)(failure to refer to media overhead charges in contract definition of "direct costs" indicated intent to exclude such charges from the definition).

The Committee also referred to Plan §2.5, which addresses employee transfers and layoffs.  Section 2 of the Plan addresses the requirements for eligibility to participate in the Plan.  For example, Plan §2.2(b) requires that the employee must be twenty-one years of age and have completed one year of eligibility service. Plan §2.3 describes the requirements for completing a year of eligibility service.  Plan §2.4 addresses the effect on eligibility of various types of breaks in service and termination.  Section 2.5(a) provides:

> (a) No transfer or other change in the employment
> classification, either voluntary or involuntary, of an
> Employee from a classification of Eligible Employees
> under this or any other Supplement to the classification
> of ineligible Employees under this or any other
> Supplement or to a different classification of Eligible
> Employees under this or any other Supplement shall be
> treated as a Break in Service or a termination of
> employment, whether or not the transferred Employee is
> reported as having resigned or otherwise ceased

17

> employment in the former employment classification. In the case of transfer to a classification of Employees who are ineligible to participate under this or any other Supplement, the transferred Employee shall no longer accrue any benefits under the Plan. In the case of transfer to a classification of Eligible Employees under any other Supplement, the Participant's rights under the Plan shall be determined pursuant to Section 3.9.

Under this section, no "transfer or other change in the employment classification, either voluntary or involuntary" is treated as a "termination of employment" even if the employee "is reported as having resigned or otherwise ceased employment in the former employment classification." Plan §2.5(a).

Defendants claim that §2.5 "explicitly excludes transfers from the employment events that will qualify as a 'termination of employment.'" Doc. 71, p. 14. Plaintiffs contend that the language in §2.5 which excludes transfers from being a "termination of employment" is applicable only in the context of determining eligibility to participate in the Plan, and that it applies only to transfers between Controlled Group employers.

The Committee's decision did not address any of these issues. The Committee did not engage in any analysis of the wording of §2.5 in its decision or express any conclusion regarding the meaning or scope of §2.5; rather, it simply stated that it had "reviewed" other Plan provisions, including §2.5 and §3.1(a). This statement occurred immediately before the Committee's observation that the fact that §3.1(a) contained an express provision regarding discharge resulting from the termination of employment following the sale of an entity, whereas §19.11(f) did not, indicated that a transfer of employment was not necessarily a "termination" for purposes of qualifying for benefits under §19.11(f). The most that this court

18

can glean from the Committee's brief reference to §2.5 is that the Committee was aware that there was precedent elsewhere in the Plan for transfers not being considered as terminations of employment. Even assuming _arguendo_ that plaintiffs are correct and that the reference to transfers in §2.5 has no application to §19.11(f) benefits, there is no language in §2.5 which would preclude the interpretation of §19.11(f) adopted by the Committee.

Plaintiffs point to language in §5.1 of the Plan, which they argue should have been considered by the Committee. Section 5.1(a), as amended effective November 18, 2008, provides:

(a) If a Participant's employment with all members of the Controlled Group terminates

(I) _for any reason_ [emphasis supplied] after the Participant has five (5) years of Vesting Service or has attained age sixty-five (65)(or age sixty-two (62) in the case of Flight Crew Members), or

(ii) by reason of the sale of Precision Printing and Packaging, Inc. on May 31, 2008, or

(iii) after the Participant has become fully vested under Section 19.11(d)

and before the Participant has satisfied all age and service requirements for retirement on a Normal Retirement Date, Early Retirement Date or Disability Retirement Date, the Participant shall be entitled to an annual Retirement Benefit equal to the Participant's Accrued Benefit determined as of the date the Participant's Credited Service ends, payable as of the Participant's Normal Retirement Date[.]

Section 5.1(a) addresses only the distribution of an accrued retirement benefit, as calculated under §4. The term "Accrued Benefit" is defined in §1.1.1 of the January 1, 2001, Supplement to the Plan as being calculated under the mathematical formula specified in §4 of the Plan Supplement, taking into account the

19

participant's final average annual earnings and credited service as of the date of determination of the benefit amount.  Under §5.1(a), an accrued retirement benefit is payable starting on what would otherwise be the participant's normal retirement date, when the participant fails to meet the eligibility requirements for the payment of a normal, early, or disability retirement benefit upon the termination of his employment.  Section 5.1(a) says nothing about eligibility for the enhanced retirement benefits provided under §19.11(f).

In the event of a Change in Control, a participant is entitled under §5.1(a) to the distribution of pension benefits which have become vested under §19.11(d).  Plan §5.1(a)(iii).  Section 19.11(d) provides that the "Accrued Benefit of each Participant who is actively employed by a Participating Employer as of the date of a Change in Control shall be fully vested."  Sections 19.11(d) and 5.1(a)(iii) together simply assure that any retirement benefits already accrued under the formula specified in Plan §4 as of the effective date of a change in control shall be fully vested and subject to distribution under §5.1(a) when the employee reaches normal retirement age.  Neither of those sections addresses how an employee might later qualify for enhanced benefits under §19.11(f) when his employment is "involuntarily terminated" within three years after a change in control, nor do they provide any insight into the meaning of the phrase "employment with the Control Group is involuntarily terminated."   No language in §5.1(a) renders unreasonable the interpretation of §19.11(f) agreed upon by the Committee.

3. Committee's Review of Evidence of Drafters' Intent

20

Plaintiffs argue that the language of §19.11(f) is unambiguous, and that it was inappropriate for the Committee to consider evidence outside the Plan language, such as evidence of the drafters' intent. As stated previously, if a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity. Eagle Industries, 702 A.2d at 1232. However, when the contract language is ambiguous, then all objective extrinsic evidence may be considered. Explorer Pipeline, 781 A.2d at 714. A contract is ambiguous when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings. American Motorists, 616 A.2d at 1196.

The question of whether a plan's contractual language is ambiguous is a question of law requiring de novo review. Wulf v. Quantum Chemical Corp., 26 F.3d 1368, 1376 (6th Cir. 1994). Once a court determines that the language is ambiguous, then all objective extrinsic evidence is considered. Id.; In re: Explorer Pipeline Co., 781 A.2d 705, 714 (Del. Ch. 2001). Traditional methods of contract interpretation used to resolve the ambiguity include drawing inferences and presumptions, considering extrinsic evidence, and looking to additional evidence that reflects the intent of the contracting parties. Wulf, 26 F.3d at 1376.

In Wulf, 26 F.3d at 1376, the Sixth Circuit found that the plan provision "termination of employment" in the context of the company's sale of a plant was ambiguous, and that the court could consider evidence in the administrative record that reflected the intent of the contracting parties. See also Farmer v. Square D. Co., 114 Fed.App'x 657, 661 (6th Cir. 2004)(phrase "involuntarily

21

terminated" was not defined by plan and was, at most, ambiguous when applied to the facts at bar).

Here, plaintiffs argue that their "employment with the Controlled Group" was "involuntarily terminated" because their employment relationships "with the Controlled Group" were terminated, even though their actual jobs were not terminated and they continued to be employed in the same jobs with Ball. Defendants argue that the common understanding of the phrase "involuntarily terminated" requires an actual job loss, and that plaintiffs' jobs were not "involuntarily terminated" because they continued to work uninterrupted in the same positions with the purchaser of MCC. In essence, this interpretation views "with the Controlled Group" as simply clarifying that it is the Controlled Group position which an employee has to lose in order to qualify for benefits under §19.11(f), as opposed to being terminated from some other job with a non-Controlled Group employer during the three-year period. Under this interpretation, termination of an employment relationship with the Controlled Group alone is not sufficient to constitute a termination of employment. The court concludes that the phrase "whose employment with the Controlled Group is involuntarily terminated" is reasonably or fairly susceptible of different interpretations and is therefore ambiguous. Thus, the Committee could consider evidence bearing upon the intent of the drafters of §19.11(f).

The Committee's decision states that it reviewed the evolution of §19.11, including relevant portions of the minutes of the meeting of the Pension Committee of the Board of Directors on September 27, 2000, and the meeting of the full Board at which the adoption of

22

§19.11 was approved.  See AR Exs. 2-F, 3-F, 4-F, 5-F.  The minutes of the Pension Committee meeting on September 27, 2000, state that

> Mr. Kelly recommended amendments to the Anheuser-Busch Companies Pension Plan ... to revise the impact of a change in control.  Recommended provisions include immediate vesting for all employees following a change in control, additional benefits for employees displaced as a result of a change in control, and provisions designed to maintain benefit levels for a period of three years after a change in control.

AR Ex. 6-C.  The summary of the Pension Committee meeting indicates that the Pension Committee "considered amendments to the Anheuser-Busch Salaried Pension Plan to ... revise the impact of a change in control to include, for a period of three years after a change in control" including immediate vesting for all employees, prohibitions against a reduction in benefits and termination or merger of the Plan, and "[a]dditional pension benefits awarded to any employee who is displaced as a result of the change in control (add 5 years to age and service)."  AR Ex. 6-C.  The summary also states, "These revisions are intended to support retention under a change in control by maintaining the status quo for a reasonable period."

The Committee also reviewed the minutes from the Board of Director's meeting of September 27, 2000.  The minutes reflect that at that meeting, the Board passed the following resolution:

> RESOLVED ... Any participant under the Supplement for the Anheuser-Busch Salaried Employees' Pension Plan ... whose employment is involuntarily terminated within three (3) years after a change in control shall receive an additional five (5) years of age for purposes of determining the participant's benefit under the Supplement and entitlement to any early retirement subsidy, or the participant's accrued benefit under the plan shall be increased by 15%, whichever produces a greater benefit; provided that benefits shall not be

23

> payable until the Participant attains age fifty-five (55) or otherwise becomes eligible for distribution under the plan.

AR Ex. 6-C.

The administrative record also includes the notes of the Committee members taken during that Committee's conversations with Tom Larson, an ABC officer who was involved in the drafting of the change in control provisions of §19.11 of the Plan. See AR Ex. 6-D. Larson indicated that in 1999, the Plan was overfunded, and that the intent of Plan §19.11 was to save pension funds for the employees, rather than an acquiring company, to preserve the assets of the Plan, and to set up a mechanism "if [an] employee [was] fired." The first two goals were implemented through provisions which: (1) prohibited termination of the Plan for three years following a change in control, see Plan §19.11(b); (2) prohibited merger, consolidation, or transfer of assets or liabilities of the Plan and the Trust Fund for three years following a change in control, see Plan §19.11(c); provided that the accrued benefit of each participant actively employed by a Participating Employer as of the date of a change in control would be fully vested, see Plan §19.11(d); and (4) prohibited, for three years following a change in control, a change in the classifications of eligible employees, a reduction in formulas for determining benefits and forms of payment, or the elimination of other benefits, rights and features available to participants, see §19.11(e). The third goal was addressed through the enhancement in years of credited service and age provided in Plan §19.11(f), under which plaintiffs now claim benefits.

Larson indicated that the discussions leading up to the

24

adoption of §19.11 did not specifically contemplate whether a divestiture of assets would constitute an involuntary termination. According to Larson, the purpose of the provision was to preserve Plan assets for employees and to "compensate for [a] loss of job." He stated that "if [the employee] was fired [the employee would be entitled to an] enhanced benefit" but that the provision was "not intended to be a 'windfall.'" See AR Ex. 6-D.

The Committee concluded that the "minutes indicate that the enhanced benefit was intended for individuals who were 'displaced' and 'whose employment is involuntarily terminated' within three years of a change in control." The Committee observed that the "focus of Section 19.11(f) appears to be the provision of enhanced benefits to those who suffer a loss of employment following a change in control." AR Exs. 2-F, 3-F, 4-F, and 5-F. The Committee further stated in its decision denying plaintiffs' appeals:

> Where a participant suffers no interruption in employment in connection with the sale of an entity or assets, the participant does not suffer the type of harm occasioned by the loss of employment that Section 19.11(f) was intended to address. The award of enhanced benefits under the Change in Control provisions under such circumstances would, contrary to the intent and purposes of Section 19.11(f), provide a windfall for individuals who otherwise are entitled to keep their same job with substantially equivalent compensation and benefits.

AR Ex. 6-C.

Plaintiffs focus on the Pension Committee's comments that the "revisions are intended to support retention under a change in control by maintaining the status quo for a reasonable period." Plaintiffs argue that since the status quo of their employment relationship with a Controlled Group employer was not maintained, the pension enhancements described in §19.11(f) must have been

25

intended to apply to their situation. However, Larson told the Committee that the persons involved in adding §19.11(f) to the Plan did not specifically contemplate a situation involving participants continuing their employment with the purchaser of an ABC company. The "retention" of plaintiffs was arguably achieved through the purchase agreement with Ball, which provided for the continuation of plaintiffs' employment with Ball the same salary. Therefore, the references in the minutes to "retention" and "maintaining the status quo" relied on by plaintiffs need not be definitively construed by the Committee as indicating an intent to provide the enhanced benefits to employees whose entities were sold but who continued working for the purchasing employer.

Plaintiffs also note the Pension Committee's comments that the "[a]dditional pension benefits awarded to any employee who is displaced as a result of the change in control" and argue that the word "displaced" must mean "involuntarily terminated" as that phrase is used in the Board's resolution. However, the word "displaced" does not clarify the phrase "involuntarily terminated", because it is also subject to more than one interpretation. Although plaintiffs would argue that they were "displaced" from their employment because they were no longer employed with the Controlled Group, the Committee could reasonably conclude that plaintiffs were not "displaced" from their employment because they continued to hold their jobs.

The record provides other support for the Committee's decision. For example, the resolution passed by the Board provides for benefits to participants "whose employment is involuntarily terminated" with no reference to employment "with the Controlled

Group." The Committee was also informed by Larson that the purpose of the provision was to compensate employees for the loss of a job and was not intended to be a windfall. The Committee could reasonably infer from the minutes of the Pension Committee, the Board of Directors, and the information provided by Larson that in passing the above resolution which formed the basis for §19.11(f), the Board intended to provide enhanced benefits only to those individuals suffered an actual job loss, _i.e._, a total loss of employment.

5. Uniform Application of §19.11(f)

An important factor in determining whether the administrator's interpretation of plan language was arbitrary and capricious is whether the administrator has consistently interpreted and applied the terms of the Plan in the past. See Fuller v. FMC Corp., 4 F.3d 255, 259 (4th Cir. 1993)(evidence of prior practice of consistently denying severance pay to employees who were offered continued employment with a purchaser supported construction of plan offered by employer); Adcock v. Firestone Tire & Rubber Co., 822 F.2d 623, 626 (6th Cir. 1987)(noting employer's consistent interpretation and application of plan provisions regarding eligibility for termination pay as an indication that the defendants' interpretation of the plan was not arbitrary and capricious); Harris v. Pullman Standard, Inc., 809 F.2d 1495, 1499 (11th Cir. 1987)(considering employer's prior inconsistent application of plan as a factor in concluding that denial of benefits was arbitrary and capricious); Sly v. P.R. Mallory and Co., Inc., 712 F.2d 1209, 1213 (7th Cir. 1983)(noting evidence of prior consistent practice of denying benefits to former employees who were immediately rehired in comparable positions by

purchasers); <u>Dalesandro v. International Paper Co.</u>, 214 F.R.D. 473, 480-481 (S.D.Ohio 2003)(noting lack of evidence that employer had consistently interpreted plan to require unemployment as a prerequisite for severance benefits).

The administrative record in the instant case includes correspondence from Committee Chair Melissa Reuscher dated April 16, 2010, responding to plaintiffs' request for the production of documents made in their appeal letters of February 18, 2010. <u>See</u> AR Exs. 2-D, 3-D, and 4-D. The April 16th letter indicates that one of the documents being produced was "a report which lists, as of February 16, 2010, the number of participants by business unit who received enhanced benefits under Section §19.11(f) of the Plan." The document referred to is entitled "NUMBER OF EMPLOYEES INVOLUNTARILY TERMINATED SINCE CHANGE IN CONTROL WHOSE DATE OF TERMINATION WAS ENTERED INTO PAYROLL SYSTEM AS OF 2/16/10." That document reveals that 1,227 employees had been "involuntarily terminated" and that none of those employees were MCC employees. The April 16th letter further states, "Our records indicate that none of those individuals was involved in a situation where, pursuant to a sale agreement between the Company and a third party, the individual continued employment in the same or similar position." <u>See</u> AR Exs. 2-D, 3-D, and 4-D. In her April 16th letter, Reuscher also stated that the November 18, 2008, merger of ABC and InBev, N.V., "is the only Change in Control event upon which any benefits pursuant to Section 19.11(f) of the Plan have been provided. AR Exs. 2-D, 3-D, and 4-D.

In its decision of June 17, 2010, denying plaintiffs' appeals, the Committee stated:

28

> The Committee has also been advised that, since November 18, 2008, when the Change in Control occurred, all Participants whose employment was transferred to a successor entity in connection with the sale of assets or an entity have been treated in a uniform and consistent manner. The Plan Administrator has consistently determined that Participants in those situations are not entitled to the enhanced benefit of Section 19.11(f).

AR Exs. 2-F, 3-F, 4-F, and 5-F.

Thus, the administrative record in this case does include information indicating that §19.11(f) benefits had consistently been denied in the cases of employees such as plaintiffs whose employment was transferred to the new owner. This consistent interpretation of §19.11(f) provides further support for a finding that the Committee's interpretation of the Plan was rational and reasonable.

6. Opinion Letter of Outside Counsel

The Committee also considered an opinion letter drafted by Hal B. Morgan, outside counsel for ABC. See AR Exs. 2-D, 3-D, and 4-D. In its appeals decision, the Committee noted that

> the opinion advised that there was a reasonable basis for the determination that individuals who were employed by a successor organization in the same capacity and with substantially equivalent wages and benefits were not involuntarily terminated within the meaning of Section 19.11(f).

AR Exs. 2-F, 3-F, 4-F and 5-F. The Committee's reliance on the opinion of counsel is not in itself a defense to plaintiffs' benefits claims. See Baylor Heating & Air Conditioning, Inc. v. Federated Mutual Ins. Co., 987 F.2d 415, 419 (7th Cir. 1993)(reliance on advice of counsel is not a defense to a breach of contract claim). However, the fact that the Committee considered advice from outside counsel prior to making a decision is some indication that the Committee's decision was the result of "a

29

deliberate and principled reasoning process." Morrison, 439 F.3d at 300; see Baylor Heating, 987 F.2d at 419 n. 6 (in determining whether decision was arbitrary and capricious, "seeking the advice of competent counsel before entering into the morass of employee benefits law would seem to be eminently reasonable behavior"). There is no evidence that the opinion letter was a product of collusion with the Committee, or was anything other than an unbiased legal opinion by outside counsel.

In the opinion letter, counsel noted that the term "involuntarily terminated" is not defined in the Plan, and that the issue was whether the phrase "employment with the Controlled Group is involuntarily terminated" applied to participants who became employed or were offered employment by the successor entity in a sale of assets. Counsel described the arbitrary and capricious standard of review, including the conflict of interest component. Counsel then discussed cases which have addressed similar plan language and its application to participants who were employed by a successor, and concluded that it would be reasonable for the Committee to deny benefits under the comparable circumstances in the instant case. Counsel discussed Plan §3.1(a), governing the severance from service date, and concluded that a different interpretation of "involuntarily terminated" for purposes of §19.11(f) would not be inconsistent. Counsel noted that there were no prior inconsistent interpretations of the language in §19.11(f) because there had been no other Change in Control since the adoption of that section. Finally, counsel stated that the proposed interpretation of §19.11(f) was not inconsistent with any specific language in the Plan. See AR Exs. 2-D, 3-D, and 4-D.

D. Discussion of Authorities

1. Decisions in the Sixth Circuit

The parties have cited a number of cases both from the Sixth Circuit and other circuits.  Plaintiffs argue that the cases cited by defendants are irrelevant, because none of these cases involved the exact language contained in the Plan.  This argument would be more persuasive if the de novo standard of review applied in this case.  As the Sixth Circuit noted in <u>Wulf</u>, because every case subject to de novo review turns on the interpretation of the specific language contained in the particular plan before the court, cases concerning plans containing different language may "furnish little guidance" and cases decided under the deferential arbitrary and capricious standard were of "limited, if any, applicability." <u>Id.</u> at 1376.  <u>See also</u> <u>Anstett v. Eagle-Picher Indus., Inc.</u>, 203 F.3d 501, 506 (7th Cir. 2000)(noting the distinction between de novo review and the arbitrary and capricious standard).  However, the instant case is governed by the arbitrary and capricious standard of review.  Other cases which have also applied that standard, albeit to claims involving nonidentical plan language and variations in the underlying facts, may nonetheless offer guidance as to how the arbitrary and capricious standard has been applied in similar situations.  In addition, some courts applying a de novo standard of review have also agreed with the administrator's interpretation of similar plan language.

In <u>Blakeman v. Mead Containers</u>, 779 F.2d 1146 (6th Cir. 1985), <u>abrogated on other grounds by</u> <u>Massachusetts v. Morash</u>, 490 U.S. 107 (1989), the employer provided severance benefits to employees who were "involuntarily terminated in the interest of the Division." 779 F.2d at 1148.  The phrase "involuntarily terminated" is also found in the Plan before this court.  Mead paid severance benefits

31

to employees at facilities that were closed, but not at facilities that were sold as going concerns, such as the facility where plaintiffs were employed and continued their employment at the same salary under the new owner. Id. at 1149. The district court granted summary judgment to the employer, concluding that the severance policy "'may be reasonably interpreted as not providing severance pay to employees who continued to work at their same salary but for a different employer following the sale of the plant.'" Id. The district court further wrote that "'it is obvious that the guidelines were meant to give severance pay benefits to employees who, through no fault of their own, lost their jobs, i.e., were involuntarily terminated.'" Id. In essence, the phrase "involuntarily terminated" was interpreted to mean an actual job loss. The Sixth Circuit concluded that Mead's decision to deny severance pay to the plaintiffs was not arbitrary, capricious or unreasonable. Id. at 1149-1151.

In Adcock v. Firestone Tire & Rubber, the severance plan provided for termination pay in the event of a reduction in force, described as a termination when "necessary to eliminate a position because of reduced workload or due to economic necessity." 822 F.2d at 624. The plan summary stated that the goal of the plan was to reduce the stress of terminated employees between the time of their release and securing other employment. Id. The administrator interpreted the plan language as not requiring benefits where the plant was sold as an ongoing concern. Id. Because plaintiffs' plant was sold pursuant to an agreement which provided that the purchaser would continue to employ them, they did not receive severance pay. Id. at 625. The Sixth Circuit concluded that the administrator's interpretation was not arbitrary and capricious,

32

noting that the plan had been consistently applied in the past, and that the administrator's interpretation was a fair reading of the plan. Id. at 626-627. The Sixth Circuit also observed that "[i]n analyzing plans such as the one at issue, courts have often held that unemployment should be a prerequisite for benefits, as severance pay is generally intended to tide an employee over while seeking a new job, and should be considered more of an unemployment benefit." Id. at 627.

In Rowe v. Allied Chemical Hourly Employees' Pension Plan, 915 F.2d 266 (6th Cir. 1990), the Sixth Circuit applied the de novo standard of review to a plan which afforded service credit to an employee "laid off for any reason" within three years of the date he would be eligible for retirement. 915 F.2d at 268. Plaintiffs were denied pension credits under this provision because they continued to be employed by Armco, the purchaser of the Allied plant where they worked. Plaintiffs argued that they were "laid off for any reason" from their employment with Allied due to the sale of plant. The Sixth Circuit concluded that "only a layoff, and not another type of separation from employment with Allied, provides continued accrual of service credits." Id. at 269. In upholding the grant of summary judgment to defendants, the court further stated that "plaintiffs' separation from Allied and immediate employment with Armco upon the sale of the Ashland Plant did not constitute a layoff." Id. (citing Garavuso v. Shoe Corporations of America Industries, Inc., 709 F.supp. 1423, 1428 (S.D. Ohio) aff'd, 892 F.2d 79 (6th Cir. 1989)).

In Garavuso, the defendant's severance pay plan provided a severance allowance to employees who were "permanently terminated or laid off by the Company due to lack of work" and further provided

33

that if the employee's job was eliminated due to lack of work, the employee would not receive a severance pay allowance "if comparable employment is offered and refused." 709 F.Supp. at 1427. When the division in which plaintiff worked was sold, plaintiff was offered and accepted employment with the new owner, and he was denied severance benefits. Applying the de novo standard of review, this court considered: (1) evidence that the purpose of the plan was to assist employees financially during a period of unemployment; (2) evidence of past practices; and (3) the language of the plan, which indicated that the plan was intended to provide an unemployment benefit rather than simply a bonus upon termination. Id. at 1426-1428. This court noted that defendant's interpretation of the plan was "a common one throughout industry" and that courts "have noted that the policy behind such plans is generally to aid employees through a period of unemployment due to layoff, during which the employee is without income." Id. at 1428. This court concluded that plaintiff did not qualify for severance benefits under the plan. Id. at 1430. This court's judgment was affirmed on appeal by the Sixth Circuit for the reasons stated in this court's opinion, and for the "further reason that a proper construction of the severance pay plan is that if one is offered a comparable job by a successor corporation and accepts the offer without a loss of compensation, no severance benefits are recoverable." See Garavuso v. Shoe Corporations of America Industries, Inc., 892 F.2d 79 (table), 1989 WL 153151 (6th Cir. 1989).

In Easterly v. Philips Electronics North America Corp., 37 Fed.App'x 166 (6th Cir. 2002), the employer had a severance plan which provided benefits upon "being laid off or separated at Company convenience." The stated purpose of the plan was to financially

34

assist salaried employees being laid off or separated at Company convenience, and the plan provided that benefits were "designed to financially assist salaried employees during the period of unemployment[.]"  The plan also provided that no severance pay would be paid to individuals who refused comparable employment.  Id. at 167.  The administrator interpreted the phrase "laid off or separated" as meaning "laid off or separated from employment," and concluded that since plaintiffs continued their employment with the purchaser of a Philips facility and never experienced a period of unemployment, they were not entitled to benefits.  Plaintiffs argued that the phrase "being laid off or separated at Company convenience" only required that they be "laid off or separated" from their employment with Philips.  Id. at 169.  Applying the arbitrary and capricious standard of review, the Sixth Circuit upheld the administrator's interpretation that benefits would not be paid to employees who continued their employment uninterrupted with the purchaser of a Philips facility in a "going concern" sale.  Id. at 167-169.  The court noted that although the plan language "laid off or separated" was ambiguous because it did not include the precise language "from employment" or "from employment with Philips," the plan's interpretation of that phrase was not foreclosed by the plan's plain language and was therefore reasonable.  Id. at 169.

      In Morgan v. SKF USA, the Sixth Circuit considered plan language which is closely analogous to the "employment with the Controlled Group" language found in the Plan in the case before this court.  The vested retirement plan provided that any employee "whose active service with an Employer ceases by reason of a layoff or a permanent shutdown of the plant at such Location, or a department or subdivision thereof" and who had attained the required service

and age combination was to receive an immediate pension. 385 F.3d
at 991. The terms "layoff" and "permanent shutdown" were not
specifically defined in the plan. Plaintiffs' division was sold,
and plaintiffs became employees of the buyer immediately after the
sale at the same facility with no period of unemployment or
interruption of wages. Id. at 990. Plaintiffs claimed pension
benefits, contending that they were "laid off" from their employment
"with an Employer" as a result of the sale. Id. at 991. The plan
administrator denied benefits, concluding that plaintiffs were not
"laid off" when they became employees of the new owner immediately
after the sale and did not have any period of unemployment or
interruption of wages as a result of the sale. The administrator
further found that "layoff" meant a temporary termination of
employment with recall rights, which plaintiffs did not have, and
that there was no "permanent shutdown" of the plant because the
facility where plaintiffs worked remained in continuous operation.
Id. Applying the arbitrary and capricious standard of review, the
Sixth Circuit concluded that the case was governed by its prior
decision in Rowe, in which the key factor was the lack of
interruption in the plaintiffs' employment because they immediately
became employees of the purchasing company upon completion of the
sale. Id. at 992 (citing Rowe, 915 F.2d at 269). The court upheld
the dismissal of plaintiffs' claims, stating:

> Even though plaintiffs may have presented an equally
> rational interpretation of layoff, we cannot say that the
> plan administrator acted arbitrarily or capriciously in
> deciding that layoff means a temporary termination or
> interruption in employment.

Id. at 993.

There are additional cases in the Sixth Circuit in which the

court disagreed with the employer's interpretation of the plan.  In Wulf v. Quantum Chemical, the Sixth Circuit concluded that a "termination of employment" for purposes of determining the distribution value of employee stock ownership accounts occurred as of the date of the sale of plaintiffs' division to another company, even though plaintiffs' employment continued with the purchaser following the sale.  26 F.3d at 1377.  Wulf is distinguishable from the instant case both by its facts and the standard of review applied.  The Sixth Circuit applied, not the deferential arbitrary and capricious standard of review applicable in the instant case, but rather the de novo standard of review, which permitted the court arrive at its own interpretation of the language of the plan.  26 F.3d at 1374.  The court considered extrinsic evidence that the purpose of the stock bonus plan was to motivate employee productivity, thereby furthering the success of SKF.  The court reasoned that the fact that this plan purpose was no longer served once the division was sold and plaintiffs were working for another company supported its conclusion that a "termination of employment" occurred on the date of the sale of the division.  Id. at 1376-1378.  In contrast, the Committee in the instant case determined that the enhanced pension benefits under §19.11(f) are in the nature of severance benefits designed to assist employees in the event of the "involuntary termination" of their employment.

Plaintiffs rely on Dalesandro v. International Paper, in which the court reviewed the Champion International Paper Company severance policy adopted shortly before the merger of Champion with International Paper Company.  214 F.R.D. at 475.  The policy provided that its purpose was "to provide certain severance and other benefits to employees of the Company whose employment is

Terminated as a result of Reorganization." The term "Reorganization" was defined as "employment action(s) resulting in an Eligible Employee's Termination during the Policy Period." The policy defined "Termination" as "a termination of the Company of the employment of an Employee for any reason other than Cause, Disability ... or death[.]" Id. at 475. However, a termination did not occur under the policy if "after the Merger the Employee is transferred to the employment of International Paper Company or a subsidiary thereof[.]" Id.

In February, 2001, International Paper sold the mill where plaintiffs were employed to Smart Papers. Id. at 476. A letter was sent to employees stating that their employment with International Paper would terminate when the sale was finalized, and that they were encouraged to seek employment with Smart Papers. Id. Plaintiffs were employed by Smart Papers, but claimed severance benefits. The administrator denied the claims, noting that the phrase "employment action" carries the connotation of an action by an employer that has an adverse effect on an employee, and concluding that if the employee continued working in the same position under the same conditions, there is no adverse effect and therefore no "employment action." The administrator further noted that although the policy defined the word "Termination," it did not specifically address the situation of the sale of a mill with offers of employment from the buyer, and therefore that term was the proper subject of interpretation by the administrator. The administrator concluded that because plaintiffs were employed by Smart Papers, they were not entitled to severance benefits. Id. at 477-478.

The court applied the arbitrary and capricious standard of review. Id. at 479. The court found that the denial of benefits

38

was arbitrary and capricious because the administrator interpreted the plan to require employees to suffer an "employment action" while ignoring the plan's express and unambiguous definition of "Termination" as occurring when the company terminates the employment of an employee "for any reason other than Cause, Disability ... or death[.]" <u>Id.</u> at 480-482.  The court noted that a previous Champion severance plan contained an express provision making employees who were hired by the purchaser ineligible for benefits, whereas the later policy had no such language.  <u>Id.</u> at 480.  The court also commented on the lack of evidence that International Paper had consistently interpreted its plan to require continued unemployment as a precondition for severance benefits. <u>Id.</u>

    <u>Dalesandro</u> is distinguishable from the case at bar.  Whereas the policy in <u>Dalesandro</u> expressly defined the term "Termination," the phrase "involuntarily terminated" is not expressly defined in the Plan before this court.  Unlike <u>Dalesandro</u>, where there was no evidence before the court that the policy had been consistently interpreted, there is evidence of consistent interpretation in this case.  The underlying facts are also distinguishable in that the plaintiffs in <u>Dalesandro</u> did not have the seamless transition of employment enjoyed by the plaintiffs in the instant case.  When their employment with International Paper was terminated, the plaintiffs in <u>Dalesandro</u> were required to go through an exit process, removing personal belongings and accounting for or turning in property owned by International Paper.  Thereafter, they went through an interview process and were hired by Smart Paper. <u>Dalesandro</u>, 214 F.R.D. at 476-477.

    In <u>Dalesandro</u>, there was evidence of a previous plan which

39

expressly made employees who were hired by the purchaser ineligible for severance benefits, _i.e._, a statement of who was _not_ eligible for benefits, phrased in the negative.  The court observed that the drafters of the plan at issue could have included a similar provision stating that plaintiffs were not eligible for severance benefits if they accepted a job with the purchaser, but did not do so.

In contrast, the Plan in the instant case includes provisions, phrased in the positive, which specifically indicate when employees _are_ eligible for benefits following the sale of an ABC entity. Under §5.1(a)(ii), a participant becomes eligible for the distribution of accrued retirement benefits "(ii) by reason of the sale of Precision Printing and Packaging, Inc. on May 31, 2008[.]" Under Plan §3.5(d)(iv), service credit is given, for purposes of determining eligibility for early retirement, to participants who were continuously employed by certain named successor entities following the sale of Busch Industrial Products Company.  As noted by the Committee, Plan §3.1 refers specifically to a termination of employment in connection with the sale of a business for the purpose of determining the employee's severance from service date.  The Committee could reasonably conclude that the fact that §19.11(f) makes no similar positive reference to continuously employed participants being eligible for enhanced benefits under §19.11(f) following the sale of an entity meant that such participants were not intended to receive §19.11(f) benefits.

Following the reasoning in _Dalesandro_, plaintiffs argue that since the Plan authors included specific language in §2.5 which excluded transfers from being considered terminations of employment, the fact that they did not include a similar exception in §19.11(f)

indicates an intent to include transfers within the scope of
§19.11(f) terminations. However, if plaintiffs' interpretation of
§2.5 is correct, then the transfers referred to in §2.5 included
only transfers from one Controlled Group position to another
Controlled Group position, and did not include a transfer of
employment to the purchaser of an outside entity. Assuming, as
plaintiffs suggest, that §2.5 refers only to a transfer of
employment within the Controlled Group, then the failure to include
similar language in §19.11(f) does not imply an intent to include
employment transferred to a new owner within the category of
"involuntarily terminated" employment. Further, unlike Dalesandro,
the record here includes information provided by Tom Larson, who
stated that the discussions leading up to the adoption of §19.11
simply did not contemplate whether a divestiture of assets would
constitute an involuntary termination of employment. Thus, the
failure of the Committee to infer an intent to include employment
transferred to a purchaser within the scope of the "involuntarily
terminated" employment referred to in §19.11(f) from the failure of
Plan drafters to specifically mention "transfer to a purchaser upon
the sale of an entity" as an exception to eligibility under that
section was not arbitrary and capricious.

2. Decisions From Other Circuits

    Other circuits have also considered claims involving plan
language similar to the language at issue in the instant case, and
the court will address a sample of those cases here. Some cases
from other circuits involving similar plan language have upheld the
administrator's interpretation. For example, in Harper v. R.H. Macy
and Co., Inc., 920 F.2d 544, 545 (8th Cir. 1990), a de novo review
case, the court held that plaintiffs were not "permanently

terminated" within the meaning of the severance plan upon the sale of their store because they continued to work without interruption on comparable terms for the purchaser of the store.  In <u>Sejman v. Warner-Lambert Co., Inc.</u>, 889 F.2d 1346, 1350 (4th Cir. 1989), the court upheld defendant's interpretation of its severance policy that plaintiffs were not "terminated" upon the sale of their division when they continued working at the same job, in the same facility, at the same tasks for comparable rates of compensation and benefits.

Plaintiffs cite <u>Harris v. Pullman Standard</u>.  That case is distinguishable from the instant case both in terms of plan language and factual circumstances.  In <u>Harris</u>, most plant workers were terminated in 1981 upon the shutdown of the plant.  Plaintiffs were offered an incentive bonus to continue working at the closed plant, and were told that they would receive the bonus in addition to all other regular severance and benefit arrangements for staying.  Upon the sale of the plant in 1984, plaintiffs continued working for the new owner, although with a twelve percent wage cut and lower benefits, and they were denied a termination allowance.  <u>Id.</u> at 1496-97.  The plan in that case provided that "for <u>all</u> involuntary terminations, other than 'lay-off', the termination allowance <u>will be granted</u>."  <u>Id.</u> at 1497 (emphasis supplied).  The plan also encouraged employees to explore other opportunities "within the company" when positions were eliminated, and provided that "[i]n the event that a new assignment cannot be identified, the employee will be eligible for the termination allowance under involuntary termination."  <u>Id.</u>  In finding that the denial of benefits was arbitrary and capricious, the Eleventh Circuit concluded that the phrase "within the company" referred only to opportunities or assignments with Pullman, not to assignments with successive

corporations.  Id. at 1498.  The court further noted a policy requirement that employees elect between unemployment benefits provided in the section on layoffs and the termination allowance, which indicated that unemployment compensation was not the purpose of the termination allowance.  Id. at 1499.  The employer was also inconsistent in its interpretation of the benefits plan, as most of the plant's salaried employees terminated as a result of the shutdown of the plant in 1981 were paid the termination allowance. Finally, the court also cited the fact that the employer violated ERISA by failing to furnish copies of the benefits policy to all salaried employees and by failing to have any claims procedure.

Plaintiffs also cite Anstett v. Eagle-Picher, a de novo review case.  The plan in that case provided that "[s]alaried employees terminated other than for cause or voluntary separation, due to the exigencies of the business situation, will be entitled to [separation] benefits."  203 F.3d at 504.  In determining that plaintiffs were "terminated" within the meaning of the plan even though they continued working for the buyer of their division, the Seventh Circuit noted that the defendant had a parallel policy for key employees which contained specific language stating (in negative terms) that employees who continued to work for the buyer were not entitled to benefits, but that the severance policy before it had no such disqualifying language.  203 F.3d at 505.  The court also commented on the distinction between de novo and arbitrary and capricious review.  Id. at 506.  As previously noted, the Plan in this case is distinguishable because it includes other provisions where the sale of an entity is mentioned, in positive terms, as qualifying participants for benefits or as being a factor which could be considered, but contains no language referring to the sale

43

of an entity in §19.11(f).

Bedinghaus v. Modern Graphic Arts, 15 F.3d 1027 (11th Cir. 1994) is likewise a de novo review case which involved distinguishable plan language.  The defendants' plan stated that an employee who is "discharged as a full-time staffer for reasons other than cause" will receive severance pay.  Id. at 1029.  The Eleventh Circuit noted that the term "staffer" was repeatedly used in the defendant's handbooks as meaning employees of the defendants, and concluded that the phrase "discharged as a full-time staffer" meant discharged as a full-time employee of the defendants.  Id.  The court also noted the distinction between de novo and arbitrary and capricious review and the need to look to the particular terms of the severance policy before it.  Id. at 1032.

E. Additional Arguments

1. Plan Eligibility Requirements

Plaintiffs argue that by interpreting the phrase "involuntarily terminated" as requiring the actual termination or loss of employment, the Committee added additional eligibility requirements to the Plan.  See Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661, 665 (6th Cir. 2004)(administrator acted arbitrarily in adding an eligibility requirement under the guise of interpreting the plan term "accident" by requiring that the insured be engaged in "unusual activity" or meet with an "external force or event" where these requirements were not found in plan documents or supported by federal common law).  Plaintiffs contend that through its interpretation of "involuntarily terminated," the Committee added as additional requirements for receiving benefits that the participant was not hired by the new owner of an entity at substantially the same salary and benefits.

44

However, there is no language in the Plan which would preclude the Committee's interpretation or compel a different interpretation. In addition, the Committee's interpretation of the phrase "involuntarily terminated" does find support in federal common law. As previously discussed, there are several Sixth Circuit cases which have upheld the administrator's interpretation of plan terms very similar to those at issue here. For example, in Adcock, where the severance plan provided for termination pay in the event of a reduction in force, described as a termination when "necessary to eliminate a position because of reduced workload or due to economic necessity," plaintiffs argued that defendants impermissibly read "unemployment" into the plan as a prerequisite for benefits, contending that there was no such requirement in the plan. 822 F.2d at 625. The Sixth Circuit rejected this argument, concluding that "it is a fair reading of the plan to require unemployment as a prerequisite" to the payment of termination pay." Id. at 627 (noting that "courts have often held that unemployment should be a prerequisite for benefits"). In Rowe, 915 F.2d at 269, the court rejected plaintiffs' argument that defendants' interpretation of "laid off" constituted an impermissible unilateral amendment of the plan, noting that it was "simply an interpretation of the Allied Plan by Allied[.]"

The Committee was called upon to interpret the meaning of the phrase "involuntarily terminated," which it was given the authority to do under the Plan. The Committee's interpretation, which finds no termination where there has been no actual job loss, is consistent with the common definition of "termination." The word "terminate" has been defined as: "To put an end to; to bring to an end[.]" Black's Law Dictionary 1511 (8th ed. 2004). The phrase

45

"termination of employment" has been defined as: "The complete severance of an employer-employee relationship." Id. The Committee could reasonably conclude that plaintiffs' employment was not brought to an end, but continued pursuant to the sale agreement with Ball. It was MCC which was terminated as an employer. Although the sale of MCC resulted in a severance of the employer-employee relationship between plaintiffs and the Controlled Group, it was not a "complete" severance of "an employer-employee relationship" because plaintiffs continued to have an employer-employee relationship with Ball.

The Committee's interpretation of the Plan is also consistent with the usual purpose of severance benefits. "[S]everance pay is largely afforded to help former employees minimize the privations of temporary unemployment while they seek new work." Headrick v. Rockwell Int'l Corp., 24 F.3d 1272, 1276 (10th Cir. 1994). A plan administrator may reasonably conclude that interpreting a plan to require benefits when "the employee has retained his same position without interruption would in no way advance this interest; indeed, rather than softening the blow of a period of unemployment, it would only serve to provide ... a happy period of double income." Id. at 1276-1277. The court in Headrick further commented, "[A]s the First Circuit has indicated, it 'beggars credulity' to suggest the ordinary employer would intend such an anomalous result 'without some clear indication to that effect in the plan documents.'" Id. at 1277 (quoting Allen v. Adage, Inc., 967 F.2d 695, 702 (1st Cir. 1992)).

2. Conflict of Interest

Plaintiffs argue that the Committee's interpretation of the Plan was tainted by the fact that the Committee members were ABC

46

employees who denied benefits under a self-funded Plan which was underfunded at the time, so that Controlled Group employers would not have to make additional contributions to the Plan. While these are factors to be considered, they do not mandate a finding that the Committee's decision was arbitrary and capricious. Were that the case, then administrators of self-funded plans would never be able to deny benefits.

There is nothing in the record which indicates that the Committee's decision was improperly influenced by a conflict of interest. The administrative record reveals that the Committee did not summarily reject plaintiffs' claims; rather, the decision included "an explanation based on substantial evidence that result[ed] from a deliberate and principled reasoning process." Morrison, 439 F.3d at 300. There is evidence that the Committee has been consistent in its interpretation of §19.11(f). The record also indicates that as of February 16, 2010, 1,227 employees whose jobs were terminated and who did not continue their employment in the same or similar position with a new owner had been granted §19.11(f) benefits. There is no evidence of a history of biased claims administration here. The fact that §19.11(f) benefits have actually been paid in a substantial number of cases to employees who, unlike plaintiffs, lost their jobs and were not immediately retained by a successor employer weighs against a finding that the Plan's self-funded status was ever a factor in the Committee's decisions to grant or deny §19.11(f) benefits.

3. Substantially Similar Terms

Plaintiffs contest the Committee's conclusion that their employment with Ball was "under terms that were substantially similar to those provided to you prior to the sale." AR Exs. 2-F,

3-F, 4-F, and 5-F.  Plaintiffs also note that, although they received the same base pay under the Asset Purchase Agreement, effective October 1, 2009, the Agreement only preserved that those salaries for a year, _i.e._, until October 1, 2010, or thirteen-and-a-half months prior to the expiration of the three-year Change in Control period.  Plaintiffs argue that the Change in Control provisions were designed to preserve the status quo for three years following a Change in Control, in other words, until November 18, 2011 (the three-year anniversary of the Change in Control).

Plaintiffs point to AR Ex. 6-B, a chart which compares the benefits provided by MCC and Ball across various pay bands.  The listed benefits include LTI (long-term incentive) packages (which may include such things as stock options), active health insurance, retired medical insurance, pension benefits, and 401(k) contributions.  With all pay bands, the base pay is the same, and with the two highest pay bands, the expected bonus is the same.  At the highest pay band, with an annual salary of $180,000, the other benefits provided by Ball were anticipated as being 20% less than the MCC benefits if LTI benefits were included in the calculation, and 5% less than MCC benefits if LTI benefits were excluded from the calculation.  The $105,000 pay band showed that the Ball benefits were 6% less than MCC benefits, both with or without LTI benefits - the Ball LTI benefits were $1,000 higher than MCC LTI benefits in this category.  The $98,000 pay band shows a 13% decrease in benefits if LTI benefits are considered, and a 9% decrease if LTI benefits are not considered.  The $65,000 pay band indicates an 11% decrease in benefits - there are no LTI benefits in this category. The administrative record does not indicate how many class members fall within each of these pay bands.

48

The Committee's decision includes a determination that plaintiffs' "base pay has remained the same and that substantially equivalent aggregate compensation and benefits have been provided as required by the Asset Purchase Agreement." AR Exs. 2-F, 3-F, 4-F and 5-F. The court surmises that the reference to benefits may stem from the cases from other circuits cited in the opinion letter from outside counsel which was reviewed by the Committee. The Sixth Circuit cases discussed above do not state that substantially equivalent benefits are a prerequisite in every case to denying severance benefits upon the transfer of employment to a new owner. See, e.g., Blakeman, 779 F.2d at 1149 (noting only that plaintiffs continued their employment at the same salary under the new owner). Rather, they focus primarily on the fact that the plan participants continued their employment with the new owner without interruption. Thus, although the Committee, which has authority under the Plan to interpret its terms, could and did consider whether substantially equivalent benefits would be available from the purchaser in determining whether the employment of participants was "involuntarily terminated" within the meaning of the Plan, there is no Sixth Circuit authority which would require the Committee to do so. The fact that the Committee did compare the employee benefits offered by MCC and Ball underscores the thoroughness of the Committee's evaluation of the Plan. The Committee's determination, after reviewing AR Ex. 6-B, that plaintiffs would receive "substantially equivalent aggregate compensation and benefits" as Transferred Salaried Employees" was within the Committee's authority to interpret Plan terms and to determine eligibility for benefits, and was not unreasonable or arbitrary and capricious.

The Committee's decision to deny benefits was also not rendered

49

arbitrary and capricious by the fact that the Asset Purchase Agreement only guaranteed base salaries for a year. While other provisions in Plan §19.11 preclude amendments to the Plan for the three-year period following a Change in Control, §19.11(f) is worded differently in that eligibility for enhanced benefits hinges on the occurrence of a triggering event, termination of employment, within the three-year period. The Committee was aware that under the Asset Purchase Agreement, AR Ex. 2-D, Ball could not reduce salaries and benefits for a year following the effective date of the agreement. The Committee determined that because plaintiffs continued to be employed in the same position at the same base pay and substantially the same benefits, their employment was not "involuntarily terminated" within the meaning of §19.11(f). In other words, the triggering event had not occurred.

Even accepting plaintiffs' argument that the Pension Committee's stated goal of maintaining the "status quo" must be read into §19.11(f), at the time of the Committee's decision denying benefits, the status quo was preserved, in that the Committee determined that plaintiffs continued to be employed in the same jobs, with the same salaries and with substantially the same benefits. The Committee had no way of knowing whether plaintiffs' salaries or benefits would be reduced following the expiration of the one-year period; there is no evidence in the administrative record that this in fact occurred. The issue of whether a transferred employee was "involuntarily terminated" within the meaning of §19.11(f) if that employee continued to work for Ball after the sale of MCC but was later terminated or incurred a reduction in salary within the three-year period following the Change in Control was not before the Committee in this case.

50

III. Conclusion

Upon review of the administrative record, the court concludes that the Committee's decision to deny benefits furnished "an explanation based on substantial evidence that results from a deliberate and principled reasoning process." Morrison, 439 F.3d at 300. The Committee's interpretation of §19.11(f) was a rational one which must be accepted "even in the face of an equally rational interpretation offered by the participants." Morgan, 385 F.3d at 992. The Committee's denial of plaintiffs' claims for benefits was not arbitrary and capricious. In accordance with the foregoing, plaintiffs' motion for judgment on the administrative record (Doc. 68) is denied. Defendants are hereby granted judgment on the administrative record. The clerk is directed to enter judgment on the administrative record in favor of defendants.


Date: January 9, 2013            _____s/James L. Graham_____
                                 James L. Graham
                                 United States District Judge